**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **KAYLA MASSEY, as mother of J.L.,** ) | |
| **a minor,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3: 23-cv-00034** |
| ) | **Judge Aleta A. Trauger** |
| **CORECIVIC, INC., CORECIVIC OF** ) | |
| **TENNESSEE LLC, DAMON T. HININGER,** ) | |
| **STEVEN CONRY, VANCE LAUGHLIN,** ) | |
| **GRADY PERRY, ELAINA RODELLA, M.D.,** ) | |
| **and DOES 1–15, INCLUSIVE,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM</u>

Before the court is the Motion to Dismiss (Doc. No. 17) filed by defendants CoreCivic,

Inc., CoreCivic of Tennessee, LLC (referred to herein, collectively with CoreCivic, Inc., as

"CoreCivic," unless necessary to distinguish between them), Damon T. Hininger, Steven Conry,

Vance Laughlin, Grady Perry, and Elaina Rodela (incorrectly identified in the original Complaint

and First Amended Complaint as "Elaina Rodella"), seeking dismissal of all claims set forth in the

plaintiff's First Amended Complaint ("FAC") (Doc. No. 15). For the reasons set forth herein, the

court will grant the motion in its entirety.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties

Plaintiff Kayla Massey, a Tennessee resident, brings suit on behalf of her minor child, J.L.,

whose father, Joshua Cody Lloyd, "was brutally beaten to death by three other inmates" while he

was incarcerated at South Central Correctional Facility ("SCCF"), a prison operated by CoreCivic.

(FAC ¶ 1.) No SCCF staff were present to prevent the attack. (*Id.* ¶ 15.) After this beating, Lloyd

complained of severe abdominal pain to "SCCF staff," and, although he was described as visibly pale, he received no medical attention. (*Id.* ¶ 16.) He was last seen alive by an SCCF correctional officer on January 23, 2022 at 2:15 a.m. After being found unresponsive in his cell at 3:28 a.m., he was taken to the local hospital, where he was pronounced dead at 5:05 a.m. (*Id.* ¶ 17.) An autopsy found that he died from internal abdominal bleeding and described the manner of death as "homicide." (*Id.* ¶ 19.) Lloyd was serving a prison sentence for non-violent drug-related crimes. (*Id.* ¶ 20.)

The plaintiff does not bring suit against the prison personnel overseeing the unit in which Lloyd was housed at the time of the assault or against the prison medical personnel responsible for providing medical care for Lloyd (or depriving him of such care). Nor does she provide any additional details regarding the assault or death. Instead, she brings suit against CoreCivic, Inc., the private prison company headquartered in Nashville, Tennessee that owns and operates SCCF; CoreCivic of Tennessee, LLC, a wholly owned subsidiary of CoreCivic, Inc. that operates all the CoreCivic facilities in Tennessee; Damon T. Hininger, the CEO of CoreCivic, Inc.; Steve Conry, Vice President of Operations Administration at CoreCivic, Inc.; Vance Laughlin, Managing Director of Operations for CoreCivic's Division 6, which encompasses SCCF; Grady Perry, Warden of SCCF; and Elaina Rodela, CoreCivic's Regional Medical Director for the area that includes SCCF. The plaintiff also names as defendants "Does 1 through 15" on the basis of her belief that "each of these fictitiously named Defendants [is] responsible legally in some manner" for the acts and omissions that led to Lloyd's death.

The plaintiff asserts that the assault on Lloyd and his ultimate death were the

direct result of the unconstitutional policies and practices of Defendants including failing to appropriately classify inmates at SCCF so that high-risk violent inmates are housed separately from nonviolent low-risk inmates such as Mr. Lloyd, failing to adequately staff SCCF to ensure that enough guards are present to prevent the

> type of inmate-on-inmate violence that Mr. Lloyd suffered, failing to adequately
> train staff at SCCF in the prevention of inmate-on-inmate violence and the adequate
> provisioning of medical care to inmates, and failing to provide adequate medical
> care to inmates at SCCF.

(*Id.* ¶ 22.)

In support of this assertion, the plaintiff points to incidents, investigations, and lawsuits that, she claims, establish CoreCivic's history of deliberate indifference to inmate health and safety. These events include a 2011 lawsuit filed by the American Civil Liberties Union based on conditions at a CoreCivic facility in Idaho; CoreCivic's being held in contempt in 2013 for violating the settlement agreement executed in that case and the state's governor ultimately ordering state officials to take control of the prison; a 2014 FBI investigation into CoreCivic's alleged practice of billing for "ghost employees"; a May 2012 prison riot in Natchez, Mississippi, the investigation into which established that "deficiencies in staffing levels, staff experience, and communication between staff and inmates" led to the riot and that CoreCivic's reports misstated the staffing levels; violent incidents in Oklahoma prisons between 2012 and 2016; a shareholder lawsuit against CoreCivic in 2016[1] and the decision of the Federal Bureau of Prisons to cancel its business relationship with CoreCivic; OIG studies in 2016 and 2017 finding widespread understaffing in Federal Bureau of Prisons facilities operated by private prison companies, including CoreCivic, going back to 2014; a 2018 jury verdict in Idaho against CoreCivic, based on a finding of deliberate and long-standing understaffing, rising to the level of cruel and unusual punishment; Congressional testimony in 2017 from a former CoreCivic guard at an undisclosed facility, attesting to medical neglect leading to the death of two inmates; and a 2020 audit released

---

[1] The court presumes that the plaintiffs are referring to *Grae v. Corrections Corporation of America*, No. 3:16-cv-2267 (M.D. Tenn. 2016), which settled and was dismissed in 2021.

by the Tennessee Comptroller, finding that CoreCivic had not properly recorded accidents, illnesses, and injuries at three of its facilities in Tennessee. (Doc. No. 15 ¶¶ 24–31.)

The plaintiff alleges that defendant Hininger was "aware of CoreCivic's policy of deliberate indifference to inmates' medical needs based on widespread media reports," including reports involving a 2017 lawsuit in San Diego; a 2017 lawsuit in Tennessee alleging that "CoreCivic Staff Ignored Scabies Infection for a Full Year"; a 2016 article referencing "wretched medical care in private immigration prisons"; and a 2018 article referencing a lawsuit by a diabetic inmate denied insulin in a different CoreCivic facility in Tennessee. (Doc. No. 15 ¶ 33.)

The plaintiff also attached to the FAC a complaint filed in another case, *Newby v. CoreCivic of Tennessee, LLC*, No. 3:22-cv-00093 (M.D. Tenn. Feb. 11, 2022), and seeks to incorporate that complaint and its exhibits into the FAC "by reference as if fully set forth herein." (*Id.* ¶ 32; *see also* Doc. No. 15-2.) *Newby* involved the 2021 murder of an inmate at a different prison operated by CoreCivic, the Trousdale Turner Correctional Facility. The complaint in that case incorporates many allegations specific to that facility and that murder, and its exhibits comprise over 500 pages of material relevant to the allegations in that case. The court takes judicial notice of the *Newby* complaint, and the fact that the case settled in mediation just six months after it was filed, but declines to incorporate this pleading by reference.

Regarding SCCF specifically, the plaintiff alleges that the same Comptroller audit found that SCCF reported 67 vacant staff positions between October 2018 and January 2019 and had a staff turnover rate of 95%. (*Id.* ¶ 31.) In addition, the plaintiff attaches to the FAC a complaint filed in another case, *Williams v. CoreCivic, Inc.*, No. 3:22-cv-00571 (M.D. Tenn. Aug. 1, 2022), brought by the representatives of three different inmates who died in 2021 while incarcerated, but

only one of whom was at SCCF.[2] (Doc. No. 15-3.) She also points to a 2010 report by the *Tennessean* of an investigation into SCCF after a series of deaths at that facility, which revealed a failure to provide adequate medical care; a 2012 report by WSMV News 4 about a lawsuit filed by an inmate alleging deliberate indifference to his serious medical needs resulting in permanent damage to his health; a lawsuit filed by the ACLU in 2014 alleging that female inmates at SCCF were subjected to unconstitutional conditions of confinement, which was settled in 2017, with CoreCivic and TDOC agreeing to make changes to the facility and to pay $1.2 million in damages to the plaintiffs; a 2014 WSMV New 4 report on a lawsuit by an SCCF inmate alleging that he had been attacked by other inmates and that prison officials had failed to protect him, despite knowing that he was in danger; a 2016 investigation by WSMV News 4 finding inmates at SCCF being denied medical care; various lawsuits filed in 2016, 2017, 2018, 2020, 2021, and 2022 by inmates at SCCF against CoreCivic and/or CoreCivic employees alleging violations of their Eighth Amendment rights, based on the denial of medical care or a failure to protect them from assault by other inmates; TDOC's investigation of an inmate death at SCCF in 2019; and a 2019 *Tennessean* report about another lawsuit by an inmate at SCCF alleging that he had been denied adequate medical care. (Doc. No. 15 ¶¶ 36–49.)

The plaintiff asserts that these incidents, investigations, media reports, and lawsuits collectively establish that "CoreCivic, its wardens, its senior officers, and its directors adopted and enforced policies and practices that demonstrated a deliberate indifference to the health and safety of inmates" and that they "established, were aware of, and did not make reasonable efforts to

---

[2] The SCCF inmate was allegedly suffering from an inadequately treated sepsis infection and pneumonia and purportedly died of a drug overdose, though the plaintiffs allege the drug overdose resulted from the inmate's attempt to self-medicate the pain he was suffering from the untreated infection. (Doc No. 15-3.)

change, policies and practices which resulted in understaffing, inadequate training of staff, misclassification of inmates, inadequate supervision of inmates, and inadequate provision of medical care to inmates at SCCF." (Doc. No. 15 ¶¶ 35, 50.) In the paragraphs of the FAC identifying the defendants, the plaintiff similarly alleges that each defendant

> was made aware of the chronic understaffing, medical neglect, misclassification of inmates, and inmate-on-inmate violence at SCCF due to the news articles, lawsuits, and the Tennessee Comptroller Audit cited [in the FAC] [and that, d]espite this knowledge, he [or she] failed to rectify the problems at SCCF, and thus implicitly authorized and approved of the conditions that led to Mr. Lloyd's brutal murder.

(FAC ¶¶ 8–12.)

Regarding Hininger, specifically, the plaintiff alleges that, under his direction, "CoreCivic instituted policies and practices that prioritized profit over inmate safety," which resulted in the above-referenced problems that led to Lloyd's murder. (*Id.* ¶ 8.) Conry, as Vice President of Operations Administration, is "directly responsible for ensuring that CoreCivic's facilities are adequately staffed and that the staff are properly trained." (*Id.* ¶ 9.) The plaintiff asserts that Lloyd's death is "directly attributable to Defendant Conry's failed oversight and calculated, profit-driven understaffing decisions. (*Id.*) McLaughlin, as Managing Director of Operations, is "directly responsible for the unconstitutional conditions at SCCF that caused the death of Mr. Lloyd." (*Id.* ¶ 10.) Perry, as SCCF Warden, was the "day-to-day overseer at SCCF" and, as such, "responsible for maintaining adequate staffing, properly classifying inmates, properly training staff, ensuring that inmates received proper medical care, and protecting inmates from one-one-one violence. (*Id.* ¶ 11.) The plaintiff also alleges that Perry was aware of the problems at SCCF because of his "personal involvement" in the incidents that were the impetus for the various lawsuits and media reports referenced above that concerned SCCF. (*Id.*) Similarly, the plaintiff alleges that Rodela, as Regional Medical Director, was "directly responsible for the unconstitutional policies and practices" that led to Lloyd's death and that she was aware of the pre-existing problems at SCCF

because of her "personal involvement" in the incidents giving rise to the reports and lawsuits involving SCCF. (*Id.* ¶ 12.) In addition, however, the plaintiff asserts her "belief" that Rodela "directly made the decision not to provide Mr. Lloyd with medical care following his brutal beating." (*Id.*)

Based on these allegations, the plaintiff purports to state a claim under 42 U.S.C. § 1983 against "all defendants," based on their violation of the Eighth Amendment's prohibition of cruel and unusual punishment. (Doc. No. 15 ¶ 55.) She asserts that the defendants, "acting individually and together," violated Lloyd's rights when they

> failed to maintain sufficient staffing levels to ensure that he was protected from inmate-on-inmate violence, failed to ensure that inmates were properly supervised to prevent inmate-on-inmate violence, failed to properly classify inmates to prevent inmate-on-inmate violence, failed to adequately train staff to prevent inmate-on-inmate violence, failed to provide adequate medical care for his injuries, and failed to adequately train staff in the provision of adequate medical care.

(*Id.* ¶ 54.) She asserts that the defendants were on notice that their actions would violate Lloyd's rights by the "numerous incidents" highlighted in the FAC that "preceded Mr. Lloyd's treatment" and that their "intentional, unreasonable, reckless, and deliberately indifferent acts were the moving force" behind the constitutional violations and the resulting injuries. (*Id.* ¶¶ 55–56.) For her Second Cause of Action, the plaintiff purports to bring a claim for "*Monell* liability" against all defendants under 42 U.S.C. § 1983. (*Id.* ¶¶ 59–70.) The plaintiff also asserts claims against all defendants under state law for negligence and wrongful death.

The defendants now collectively seek the dismissal of all claims against them under Federal Rule of Civil Procedure 12(b)(6), based on the failure of the Amended Complaint to allege facts sufficient to state colorable claims against them for which relief may be granted. The plaintiff has filed a Response in opposition to the Motion to Dismiss (Doc. No. 21), and the defendants filed a Reply (Doc. No. 22).

## II.     STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

**III.    DISCUSSION**

**A.    Section 1983**

"Section 1983 provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 494 (6th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 1983). To prevail on a claim under § 1983, a plaintiff must show "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010)).

The CoreCivic entities and the individuals employed by them are deemed to have been acting under color of law by performing the "traditional state function" of operating a prison. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993)). CoreCivic, however, as a private entity performing a government function, "can be found liable under § 1983 [only] where the [entity] *itself* causes the constitutional violation at issue," through execution of its own policies or customs. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell*, 436 U.S. at 694–95). Thus, although the plaintiff identifies CoreCivic as a defendant with respect to both the First Cause of Action and the Second Cause of Action, only the Second Cause of Action references *Monell* liability and alleges that CoreCivic "policies, practices, and customs . . . were the driving force behind" the purported constitutional violations that led to Lloyd's death. (FAC ¶ 70.) Because CoreCivic may only be liable for causing a constitutional violation through execution of its own policies or customs, the court construes the Amended Complaint as asserting only one claim against CoreCivic under § 1983—the claim in the Second Cause of Action.

Further, for purposes of municipal liability claims, "individuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). Thus, "[o]fficial capacity suits . . . represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* (quoting *Monell*, 436 U.S. at 690 n.55). As long as the entity itself "receives notice and an opportunity to respond, an official-capacity suit 'imposes liability on the entity that he represents.'" *Id.* (quoting *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985)).

Although the plaintiff here does not specify whether CoreCivic officials are sued in their individual capacity or official capacity, she asserts in her Response to the Motion to Dismiss that she "does not intend to bring claims against the Individual Defendants in their official capacities." (Doc. No. 21, at 9.) The court presumes, based on the manner in which the claims have been articulated, that the plaintiff's "First Cause of Action" is intended to state claims against the CoreCivic officials in their individual capacity. The Second Cause of Action, asserting "*Monell* Liability," is directed to all defendants. Based on the plaintiff's assertion that she does not intend to state official-capacity claims against the individual defendants, and because *Monell* pertains to entity liability, the court will construe the Second Cause of Action as asserting a *Monell* claim against CoreCivic only.

### 1. *First Cause of Action: CoreCivic Officials in Their Individual Capacity*

Section 1983, as indicated above, imposes liability on anyone who causes another to be subjected to a deprivation of his constitutional rights. 42 U.S.C. § 1983. In this case, the plaintiff alleges that the individual defendants deprived Lloyd of rights secured by the Eighth Amendment of the United States Constitution by (1) failing to protect him from "inmate-on-inmate violence," and (2) failing to provide him access to adequate medical care. (Doc. No. 15, ¶ 22.)

As suggested above, "a § 1983 individual-capacity claim differs from a § 1983 official-capacity claim." *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016). While an official-capacity claim against a person is "essentially a claim against the municipality," "an individual-capacity claim seeks to hold an official personally liable for the wrong alleged." *Id.* at 241 (citations omitted). Regarding such individual-capacity claims, the law is clear, first, that supervisory officials "may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*." *Id.* (quoting *Iqbal*, 556 U.S. at 676). That is, "a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.* Rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. Each defendant must be personally involved in the unconstitutional action." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 490 (6th Cir. 2020) (internal quotation marks and citations omitted)). Under this standard, a "mere failure to act" will not establish supervisory liability, even "in the face of a statistical pattern of incidents of misconduct." *Peatross*, 818 F.3d. at 241 (citations omitted). Likewise, a supervisor's "failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Id.* (citation omitted). The Sixth Circuit has repeatedly held that this standard, "at a minimum," requires that the supervisory defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (citations omitted).

The plaintiff here alleges that Hininger, as CEO, was responsible for the institution of CoreCivic policies and practices that "prioritized profit over inmate safety, which resulted in the unconstitutional understaffing, misclassification of inmates, medical neglect, and overall

indifference to inmate safety and inmate-on-inmate violence at SCCF that led to Mr. Lloyd's brutal murder." (FAC ¶ 8.) In other words, Hininger was allegedly responsible for policies that led to practices that led to Lloyd's death. And he was allegedly generally aware of problems at SCCF through news articles, lawsuits, and investigations, which, the plaintiff alleges, demonstrate his "willingness to place CoreCivic's profits over the health and safety of inmates." (*Id.* ¶ 24; *see also id.* ¶¶ 32, 33.) The plaintiff asserts that, despite his knowledge of them, Hininger "failed to rectify the problems at SCCF and thus implicitly authorized and approved of the conditions that led to Mr. Lloyd's brutal murder." (*Id.* ¶ 8.)

Similarly, the plaintiff alleges that Conry, as Vice President of Operations Administration, was "directly responsible for ensuring that CoreCivic's facilities are adequately staffed and that staff are properly trained" and that "Lloyd's murder is directly attributable to [his] failed oversight and calculated, profit-driven understaffing decisions." (*Id.* ¶ 9.) Conry was allegedly generally aware of the same "chronic understaffing, medical neglect, misclassification of inmates, and inmate-on-inmate violence at SCCF" due to his knowledge of the news articles, lawsuits, and investigations catalogued in the FAC. (*Id.*) "Despite this knowledge, he failed to rectify the problems at SCCF, and thus," according to the plaintiff, "implicitly authorized and approved of the conditions that led to Mr. Lloyd's brutal murder." Paragraph 9 is the only paragraph of the FAC that mentions Conry's name.

Similarly, Vance Laughlin is mentioned only in paragraph 10, which alleges that, in his role as Managing Director of Operations for the CoreCivic division that encompasses SCCF, he was "directly responsible for the unconstitutional conditions at SCCF that caused" Lloyd's death." (*Id.* ¶ 10.) He, too, was allegedly aware of the chronic problems at SCCF due to the same news articles, lawsuits, and investigations, but, despite this knowledge, "failed to rectify the problems

at SCCF, and thus implicitly authorized or approved of the conditions that led to Mr. Lloyd's brutal murder." (*Id.*)

Regarding these three defendants in particular, it is clear that the plaintiff has conflated the concepts of individual- and official-capacity liability. Because Hininger, Conry, and Laughlin are not alleged to have had any personal involvement in, or knowledge of, the specific incidents of misconduct that led to Lloyd's death, irrespective of their responsibility for implementing policies and practices, the FAC does not allege facts that would make these defendants individually liable. *Accord Phillips v. Roane Cty.*, 534 F.3d 531, 543 (6th Cir. 2008) (finding that the plaintiff's allegations regarding the supervisory defendants' "collective failure to train their employees as to the proper protocols" did not constitute sufficient evidence for individual liability and, instead, "improperly conflate[d] a § 1983 claim of individual supervisory liability with one of municipal liability").[3]

The individual-capacity claim against Warden Perry fares no better. The single paragraph of the FAC that identifies Perry and provides the purported basis for his liability is virtually identical to those pertaining to the other individual defendants, except that the plaintiff adds that Perry, having day-to-day oversight of the prison, was "deliberately indifferen[t]" to the problems at SCCF, *i.e.*, the "chronic understaffing, medical neglect, and indifference to inmate safety," and that Perry "directly ordered the conditions that led to Mr. Lloyd's brutal murder." (*Id.* ¶ 11.) This entirely conclusory assertion does not suggest that Perry was individually liable for Lloyd's death.

---

[3] *See also Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (where the plaintiff alleged that the supervisory defendant could be held personally liable for "her alleged failure to adequately supervise assistant county prosecutors or for her adherence to or continuation of a policy that . . . abdicated her responsibility to act on remand orders," holding that the plaintiff's argument "'improperly conflate[d] a § 1983 claim of individual supervisory liability with one of municipal liability'" (quoting *Phillips*, 534 F.3d at 543) (some internal quotation marks omitted)).

At most, it suggests official-capacity liability based upon the implementation and promulgation of prison policies. It is not accompanied by actual facts suggesting that Perry himself "either encouraged the specific incident of misconduct" that led to the violent assault on Lloyd or the neglect of his medical condition or that Perry was contemporaneously aware of or "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Peatross*, 818 F.3d. at 241. Notably, the plaintiff does not allege unconstitutional conduct by specific officers under Perry's supervision.

The allegations in the single paragraph addressed to Rodela are virtually identical, except that the plaintiff adds that this defendant "is believed to have directly made the decision not to provide Mr. Lloyd with medical care following his brutal beating by three other inmates at SCCF." (*Id.* ¶ 12.) This assertion is troubling, but it is not sufficient to state a claim against Rodela. If it is true that Rodela personally made the decision not to provide Lloyd with medical care after his beating, that might be enough—depending on the circumstances—to give rise to personal liability. But it might not. Here, the plaintiff does not allege why she believes this, nor does she allege particularized facts suggesting that, even if Rodela made the decision not to offer medical treatment to Lloyd, she acted with "deliberate indifference to the health or safety of the inmate." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference entails something more than mere negligence." *Burwell v. City of Lansing*, 7 F.4th 456, 465 (6th Cir. 2021) (internal quotation marks and citation omitted). The plaintiff does not allege facts suggesting that Rodela was on site, saw Lloyd, talked to anyone about his condition, or had any reason to know the extent of his injuries. The plaintiff, in short, has not pleaded "factual content that allows the court to draw the reasonable inference that [this]

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79. The allegations are not "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

The FAC is devoid of any allegations that the named individual defendants had any personal involvement in, or knowledge of, a particular instance of understaffing that led to the plaintiff's brutal beating, with no intervention by prison guards. Nor does the FAC allege that any defendant knew that, or recklessly failed to ascertain whether, Lloyd was suffering from a serious medical condition as a result of the beating or that any defendant was deliberately indifferent to his need for medical treatment. Lloyd's death is indisputably tragic and was likely preventable. The plaintiff, however, has not alleged facts that would make the named individual defendants personally and individually liable for his death.

### 2. *Second Cause of Action:* Monell *Claim Against CoreCivic*

The Supreme Court has held that a municipality is a "person" that may act under color of state law and incur liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Likewise, CoreCivic, as a private entity performing a traditional state function in operating a prison, also acts under the color of state law and may be liable under § 1983. *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). The liability of an entity like CoreCivic is analyzed in accordance with *Monell* as if it were a municipal entity. *See id.*

Municipalities and prison contractors are not subject to *respondeat superior* liability in § 1983 actions; rather, they are responsible only for injuries caused by those acts that may fairly be said to represent official policy or a custom that, although not "formally approved by an appropriate decisionmaker," is nonetheless "so widespread as to have the force of law." *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495–96 (6th Cir. 2008) (citation omitted). "A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Memphis, Tenn. Area Local v. City of Memphis*, 361

F.3d 898, 902 (6th Cir. 2004). For a custom, as opposed to a formal policy, to give rise to *Monell* liability, the custom "must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne Cty.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). Such a custom "must include '[d]eeply embedded traditional ways of carrying out state policy.'" *Id.* (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).

Besides demonstrating an underlying constitutional violation, "[a] plaintiff bringing a § 1983 claim against a municipality [or a contractor like CoreCivic] must . . . identify the [entity's] policy or custom that caused her injury." *Id.* at 495. The Sixth Circuit has identified four ways a plaintiff can "make a showing of an illegal policy or custom," as required to establish entity liability under § 1983:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

In addition to identifying a policy, however, the plaintiff must also

> demonstrate that, through its deliberate conduct, the [entity] was the "moving force" behind the injury alleged. That is, a plaintiff must show that the [entity's] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [entity's] action and the deprivation of federal rights.

*Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 387, 404 (1997); *see also Ford*, 535 F.3d at 497 ("The key inquiry thus becomes whether, in viewing the County's policy in the light most favorable to [the plaintiff], there was sufficient evidence for reasonable minds to find 'a direct causal link' between the County's policy and the alleged denial of [the plaintiff's] right to adequate medical care."); *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (explaining that, because § 1983 "is to be read in harmony with general principles of tort immunities and defenses rather than in

derogation of them," "a § 1983 plaintiff must establish both causation in fact and proximate causation" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976), and then *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011)). In other words, "a plaintiff must identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred *because of* the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted) (emphasis added).

As set forth above, the plaintiff alleges that Joshua Lloyd's death was the "direct result" of CoreCivic's unconstitutional policies and practices, including

> failing to appropriately classify inmates at SCCF so that high-risk violent inmates are housed separately from nonviolent low-risk inmates such as Mr. Lloyd, failing to adequately staff SCCF to ensure that enough guards are present to prevent the type of inmate-on-inmate violence that Mr. Lloyd suffered, failing to adequately train staff at SCCF in the prevention of inmate-on-inmate violence and the adequate provisioning of medical care to inmates, and failing to provide adequate medical care to inmates at SCCF.

(FAC ¶ 22.)

In support of these allegations, as set forth above, the plaintiff alleges numerous other instances of violence and medical neglect at CoreCivic facilities around the country and at SCCF going back for more than a decade. (*Id.* ¶¶ 24–34, 36–49.) The plaintiff asserts that CoreCivic was aware of these incidents due to news reports, lawsuits, and internal and external investigations and that the sheer number of incidents establishes that CoreCivic "adopted and enforced policies and practices that demonstrated a deliberate indifference to the health and safety of inmates," that it was "aware of, and did not make reasonable efforts to change, policies and practices [that] resulted in understaffing, inadequate training of staff, misclassification of inmates, inadequate supervision of inmates, and inadequate provisioning of medical care" to SCCF inmates (*Id.* ¶¶ 35, 50.)

Under her "Second Cause of Action," the plaintiff explicitly bases her claim on CoreCivic's purported failure "to train, adequately supervise, and discipline staff regarding the

appropriate segregation of violent and non-violent offenders and provision of adequate medical care," despite its knowledge of "the multiple failures in policy at SCCF" and knowledge of "the need to supervise, train, investigate, and discipline" employees at SCCF in order to "mitigate unreasonable risks of harm to inmates" in CoreCivic custody. (*Id.* ¶¶ 60–63.) She also asserts that CoreCivic "failed to establish and maintain policies to mitigate known serious risks of harms"— including policies to "adequately classify inmates or develop and implement an adequate classification plan," "ensure adequate investigation into critical incidents," "implement corrective action plans to address the known substantial risks of harm" described in the FAC, "ensure staff adequately supervised inmates," "investigate incidents of harm," "provide appropriate training, disciplinary procedures, and supervision of staff," "ensure adequate staffing so as to encourage inmate-on-inmate violence and effectively create inhumane conditions of confinement that allowed known substantial risks of serious injury to go unmitigated," "follow or enforce basic jail guideline requirements," "establish or enforce policies regarding the proper provisioning of medical care to inmates," "engage in oversight sufficient to prevent constitutional rights violations," and "respond to obvious violations of constitutional rights of people held at SCCF"— despite actual knowledge that these failures would deprive individuals in its custody of constitutional rights. (*Id.* ¶ 65–67.)

According to the plaintiff, these policies or failures to enact policies were "a moving force in the substantial risk of harm and unconstitutional conditions of confinement leading to Mr. Lloyd's death" and resulted from CoreCivic's "deliberate indifference and disregard for the safety and constitutional rights of Mr. Lloyd" and "deliberate indifference to the [identified] problems." (*Id.* ¶¶ 68, 69; *see id.* ¶ 70 (asserting that these policies were the "driving force behind the numerous constitutional violations in this case that directly and proximately caused Mr. Lloyd's death").)

In support of its Motion to Dismiss, CoreCivic argues that (1) aside from the conclusory allegations about a CoreCivic policy of chronic understaffing, the plaintiff makes "no *factual* allegations that purported 'understaffing' caused or contributed to [Lloyd's] alleged assault" (Doc. No. 18, at 8); (2) the plaintiff's allegations that CoreCivic has a "policy of deliberate indifference toward inmates' medical needs" (FAC ¶ 33) fail to state a claim, because she does not include any facts showing either a "clear and consistent pattern" of providing constitutionally inadequate medical care at SCCF or that such a policy was the "moving force" behind Lloyd's death (Doc. No 18, at 12); (3) the plaintiff fails to state a claim based on a purported "failure to train," again because she has not alleged actual facts related to the purportedly inadequate training or shown a causal a connection between Lloyd's death and such inadequate training (*id.* at 13–14); and (4) the plaintiff fails to state a claim based on a "ratification" theory, because, again, she fails to make a *prima facie* showing of a causal connection between a policymaker's "ratification" of a decision and the alleged constitutional violation (*id.* at 15–16).

In response, the plaintiff asserts that dismissal is not appropriate, because she has adequately (1) alleged the existence of illegal policies, specifically CoreCivic's policies or customs of "failing to adequately classify inmates, failing to ensure staff adequately supervised inmates, failing to investigate incidents of harm, failing to appropriately train and discipline staff, and failing to ensure adequate staffing levels to effectively leave inmates under [its] care unprotected from violence and without adequate medical care"; (2) "connected these policies" to CoreCivic and demonstrated its knowledge that these failures are causing injury in CoreCivic facilities around the country and at SCCF specifically; and (3) alleged that these policies were the "moving force" behind Lloyd's death. (Doc. No. 21, at 4.) She alleges that her facts distinguish this case from a previous case in which the court dismissed a claim against CoreCivic based on similar allegations,

because she has actually identified incidents at SCCF that put CoreCivic on notice of the inadequacy of its policies and problems at SCCF, thus making it clear that Lloyd's death was a result of CoreCivic's deliberate indifference to the effect of its policies. (*Id.* at 5.)

The plaintiff also asserts that, without discovery, she "does not know all the specifics of CoreCivic's policies, have access to its files regarding employee training or discipline, or have access to its records containing information about similar incidents of lack of protection and lack of adequate medical care that have taken place at CoreCivic facilities or at SCCF specifically." (*Id.* at 10.) She maintains that her case should be permitted to proceed to discovery.

As an initial matter, the plaintiff's purported inability to access CoreCivic's documents without discovery, and thus to obtain facts to support her *Monell* claim, does not entitle her to obtain discovery or avoid dismissal of her claim. Following *Iqbal* and *Twombly*, the law is clear that a party may not allege a fact, such as the existence of a policy, and hope that discovery will reveal facts to support the claim. *See Iqbal*, 556 U.S. at 686 ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise."); *Holliday v. Wells Fargo Bank*, NA, 569 F. App'x 366, 372 (6th Cir. 2014) ("It is well settled that a party cannot 'use the discovery process to obtain [the facts it needs to support its claim] after filing suit.'") (alteration in original) (quoting *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011)).

Likewise, it is well established that a court "may not 'accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action.'" *Lee v. Vanderbilt Univ.*, No. 22-5607, 2023 WL 4188341, at *2 (6th Cir. June 22, 2023) (quoting *New Albany Tractor*, 650 F.3d at 1050). Here, although the FAC contains specific allegations about other incidents, lawsuits, news reports and investigations, including some incidents at SCCF, from

which the plaintiff extrapolates CoreCivic's knowledge of problems at SCCF, the plaintiff does not actually draw a causal link between problems at SCCF and Lloyd's death. To state a claim under § 1983, the plaintiff must, at a minimum, make a *prima facie* showing of some causal connection between CoreCivic's allegedly unconstitutional conduct and the alleged injuries.

Regarding the actual incident at issue, the FAC contains essentially *no* facts aside from the bare assertions that Lloyd was assaulted by three other inmates, the incident was not witnessed or stopped by any prison guards, and Lloyd thereafter complained of severe abdominal pain and looked pale but did not receive medical care. Even if the court gives the plaintiff every possible benefit of the doubt and draws all possible inferences in her favor, these allegations are not sufficient. The FAC simply asserts that there were problems at SCCF and that Lloyd was attacked and died without medical care. The plaintiff fails to establish a *prima facie* showing of the requisite causal connection between CoreCivic's allegedly serious shortcomings and the injuries at issue in this case.

For instance, the plaintiff alleges that CoreCivic was on notice of problems at its facilities caused by chronic understaffing, but she does not actually allege facts showing that SCCF was actually understaffed in early 2022, when Lloyd died, or, more to the point, that it was not fully staffed on the day Lloyd was assaulted. She alleges that CoreCivic has a policy of misclassifying violent individuals and of housing violent and non-violent offenders together, but she does not allege that the individuals who attacked Lloyd were actually violent offenders whom CoreCivic knew or should have known were misclassified or that any of them had a history of similar violent incidents. Regarding the lack of medical care, the plaintiff alleges a policy of inadequate medical care for inmates, but she does not allege facts from which it can even be inferred that the guards

and medical staff knew or recklessly disregarded evidence indicating that Lloyd was seriously injured and needed medical assistance.

The plaintiff makes no attempt to fill out the details of the incident giving rise to Lloyd's death, and this failure is fatal to her claims. The FAC contains only the "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" and a "formulaic recitation of the elements of a cause of action" that the Supreme Court has found insufficient to satisfy Rule 8 of the Federal Rules of Civil Procedure. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The "naked assertion[s]" devoid of "further factual enhancement" set forth in the FAC here are "merely consistent with" CoreCivic's liability, giving rise to the possibility that CoreCivic has "acted unlawfully." *Iqbal*, 566 U.S. at 678. These allegations do not meet the pleading standards adopted by the Supreme Court. While, as the court has noted elsewhere, the number of lawsuits and deaths at CoreCivic facilities around the country, including SCCF, is both alarming and compelling, the existence of problems, *per se*, does not support an inference that these problems caused Lloyd's injuries and death. Some facts drawing a connection are required. The FAC fails to state a claim under § 1983 against CoreCivic.

### B.    Claims Against "Does 1–15"

The defendants also seek the dismissal of the claims against "Does 1–15" on the basis that the claims against them under both 42 U.S.C. § 1983 and state negligence law are subject to a one-year statute of limitations and, therefore, are now time-barred. The plaintiff's Response concedes that the applicable statute of limitations has run as to these defendants. (Doc. No. 21, at 9.)

### C.    State Law Claims

Given, in particular, the failure of the FAC to allege particularized facts, in conjunction with the court's determination that the FAC fails to state colorable claims under § 1983, the court

will decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3); *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009).

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant the defendant's Motion to Dismiss in its entirety. The claims against "Does 1–15" will be dismissed with prejudice, as the claims against these unidentified defendants are time-barred. The claims against CoreCivic and the named individual defendants will be dismissed without prejudice. The state law claims over which the court declines to exercise jurisdiction will likewise be dismissed without prejudice.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge